Good morning, Your Honors. Carl Hittinger for Appellant, Barbrock Washroom Equipment, Inc. If I could reserve eight minutes for rebuttal, please. In this trade dress matter before the Court, the evidence shows that Appellee A.S.I. introduced his Roval product line in October 2009 with, as the District Court expressly found, the specific intent of copying verbatim Barbrock's unique and expensive contour line that had been established in 1993. The Roval line is a mirror image of the contour line even down to the advertisements used, only a small hidden A.S.I. logo separates the two products. A.S.I. recognized the goodwill that Barbrock had established and promoted over the years at great expense and simply wanted to have a free ride. So, you know, I've read pretty much – this is an interesting case. I've read the briefs and everything. But there was a trial here, right? Yes, sir. Extensive findings of fact by Judge Wilson, correct? They were findings of fact, not extensive. They were pretty thorough. I read them. They seemed pretty thorough to me. They were thorough in the face, but there are many pieces of evidence. Okay. So tell me, where did he go fundamentally wrong that would warrant a reversal? On several grounds. On his findings of fact, you know, if you're going to challenge his findings, you have to convince us that they were clearly erroneous. Yes, we do. Let me start with functionality. Okay. As this Court has made clear in many, many cases, including Your Honor's case in Cyberdyne, functionality requires an analysis of the entire product at issue. And a product may have various features. In this particular case, the product – We're talking about trade dress now. Yes, yes. We're not talking about the convex. Well, there's six features to this product. And one of the features is the convex art, one of six. What this district judge did is he focused primarily on that feature and found that that feature had certain functionality that made the product functional. Now, as this Court has made clear in any number of cases, you know, Leatherman, Seacolt, on and on, you have to – and also in Cyberdyne, you need to look at the entire product. The entire product, which may have various features. Well, you know, that point is drawn out and is really highlighted in earlier cases of Fuddruckers and clicks, failures. Yes, it does. But are those cases different than this? In other words, what I understand the district court judge to say is that each of the elements of the product, right, that you've pointed to, that everybody's pointed to, are all – have some functionality. And you put them all together, you still got functionality. It's functional. Well, you can have a situation where a part of a product, like Fiji water, has functionality, but the entire product does not have functionality. This Court's found that before. Judge Hurwitz has got a question. I want to ask you, because you said the judge focused solely on the convex nature. Is that what your position is? He focused primarily on that. He made very short shrift to the other features. Well, I'm looking at Exhibit 59, which is the original advertisement that your client put out and put out for a year. Right. And it talks about the functionality of the heavy gauge stainless steel as having lasting quality and durability, making it easier to clean. It talks about the functionality of the rounded towel trays with hemmed openings for safety and resistance, and it talks about the durability up to the rigors of heavy use, et cetera. Why isn't that all sufficient evidence from which a judge could find that the entire product was functional? Well, first of all, that was a 1993 advertisement that ran for a while. But it's the same product, though. It's the same product. It ran in 1993, which was 10 years before ASL. Did the product change between 1993 and the alleged infringement? It did not change in terms of its construction, no. Okay. So why isn't this evidence that your client viewed the product dysfunctional? Well, I think, Your Honor, the better evidence, if I may, is if you look at ER 4610, this is a memorandum that was prepared by ASI employees when they came out with the Roval line, assessing why they should do this, why they should come out with this product. And what that document talks about, and this was produced, of course, during trial because of the spoilation problem, it talks about the aesthetics of the product. And the reason ASI wants to come out with this product is because it has aesthetic use and it would not make any sense to have two different products with two different looks, which may confuse the marketplace. There's no mention at all in that document of functionality. This is a more argumentative justification. Let's assume that ASI, because I'm willing to do it, had the most evil of motives and that they thought they were copying this for aesthetic reasons. But isn't the question whether the product is functional a determination to be made by the judge, aside from the motives of ASI? If ASI thought it was functional, you wouldn't say that was determinative. I'm not sure why it's determinative that ASI thinks it's not functional. Well, let's look at the product. What does the product do? It dispenses paper towels, it dispenses female sanitary napkins, and it holds waste. Now, how is the fact that the Convex Arc has some additional strength helping that product, how does that make that product work better for those purposes? That's the purpose of the product, to do those things. And that Convex Arc in no way, shape, or form helps that purpose. So when your client advertised it as helping that purpose as such, they were not stating the truth. It doesn't say, with all due respect, Your Honor, it doesn't say that that's the purpose of the product. What it says is the product in that advertisement is being presented because of the aesthetic value of it, and it also has an ancillary strength use. It says that. Well, it says it's being presented in response to maintenance contractor needs. I assume the maintenance contractors weren't worried about aesthetics. They were worried about being able to clean and put and resupply the towels, et cetera. And then there's a lot of description about why the paper towel dispensers are better and why it's easier to clean. Why isn't that functionality? I understand the judge may have, in your view, weighed the facts wrong, but what if under the sort of current error standard we have to apply to the judge's findings, why is that enough to support it? Well, I think that the analysis, as Your Honors know, should be under Cybergun, should be under Leatherman, should be under CECOL, where you're looking at the entire product and you're looking at all aspects of the product to determine whether or not those aspects make the thing work better. Okay? So this convex arc, the stainless steel strength, how does that make the product work better? There's no evidence of that. The burden is on ASI to present that. He presented no evidence that that was necessary to make this product work better, just like the Cybergun case. How does the handle make the gun work any better? It doesn't. It works the same, and that's what you're on to conclude recently in that case. So I think, yes, there's a range of findings we have, we know that, but we think that overall the evidence doesn't support your position of functionality. It doesn't make this product work any better. Does durability come into functionality? Well, durability would come in, I mean, this microphone is durability, but the function of the microphone is not to have the stainless steel. It's to have something that works better. That's the whole purpose of it. Every product has some ancillary functionality that goes with it. In the Fiji water case, for example, which we cite, there's a case where the product is water. Now, the rectangular bottle makes it easier to put it on the shelf, but that doesn't give support functionality. The function of the product is to dispense water. It may have an ancillary purpose that's functional, but the main purpose, the overall purpose under Fuddruckers is not functional. We think that's the test. So let me ask you this. So just craft your argument. So the judge found that each of the elements, the flanges, the convex, the steel, the way it's dispensed, he found that it was all those parts were functional, had functionality, some functionality. Okay? Right? Well, beyond the convex arc, the other things he talked about with hinges and flanges, again, he didn't talk about how that helps the overall purpose of the product. He didn't go into that. It was just a passing sentence in a long opinion. Well, I got the impression that he did. So, okay, so you're stuck with his findings. Right. So if you're saying that he erred by not taking, looking at the entire product, what is it that he was supposed to have done next? In terms, I'm sorry, I don't know. Well, in concluding that their product, the ASI Roval, violated their trade dress rights. Right. Okay, so he made those findings on the individual elements. How did he mistake? I mean, what did he do wrong then? Or what should he have done next in order for you to have prevailed? Well, he should have looked at all the other disc golf factors. And one of those factors, important factors, is are there alternative designs? And in this case, Evans was presented with the ASI as three alternative designs that they can use and have used to compete against Bobrick with this product. They're not being shut out of the marketplace because of this product and trade dress. They have products that serve the same purposes and they've been selling in the marketplace. We have many, many products that serve the same purposes in the marketplace. This is not a case where this is the only way to do it. There's a lot of ways to do this and they've been doing it for 16 years and competing effectively. And that's a factor the Court should have considered. He did not consider that factor. He just moved on. What else? But, you know, we start out with a proposition that it's all right to copy. All right to copy. And now is there evidence of confusion as the source here? Yes. There is evidence of confusion as the source. Such as? In this particular case, we had a survey that showed that 35 percent of architects were confused as the source of this product. The district court here rejected the survey entirely. It rejected it, did not consider it in terms of weight or anything else, rejected that. The court also did not seriously consider or should have considered evidence that was presented by customers and distributors, but they were confused about this product. So there was evidence of confusion. Well, he made a final lack of confusion, that there was no lack of confusion. Yes. He found that. And we think that was an error based upon the testimony that was presented. But the major mistake he made on confusion was the intent requirement. We've talked a lot about intent today in other cases. This Court, Your Honor, in the Ampis case, the American motion picture case, decided that intent that's required for confusion is not intent to deceive customers. It's intent to copy. In this particular case, this district judge found that the intent required was intent to deceive customers. That is not the law of this circuit. It's never been the law of this circuit, at least since 1969. And what he relied upon for that is my hometown, Third Circuit cases that talk about that kind of intent requirement. Those cases aren't binding on this Court. Those cases were issued before Wal-Mart was issued by the Supreme Court. And this Court has made it very clear, going back to 1969, you have to show just intent to copy. Once you show intent to copy, that creates a presumption that there's confusion. In this case, the Court required much more than that, and we think that's an error and contrary to the law of this circuit. Can you address the district court's finding that there was no secondary meaning here? Isn't that a factual determination also? Yes. And once again, we think that the district court, with all due respect, applied the wrong standard. Judge Pegerson, in your Arditax case, you talk about eight factors that need to be considered under that standard. In this case, the judge only considered four factors. He did not consider Barber's sales volume, testimony, et cetera, on and on, as set forth in our briefs. He also, again, made a mistake on intent. All that's required for intent is an intent to copy. And once again, he required much more than that, intent to deceive customers. And he relied upon cases, again, not even in this circuit, for that proposition. And so we think that's a permeating factor, a main factor throughout this opinion, this intent requirement that goes beyond what this Court has ever required, including members of this panel in prior cases. That mistake, if you will, doesn't extend to the functionality finding, does it? No. There's no intent requirement or functionality. Right. So even assuming the judge was in error with respect to the intent, that would not be an error in your view that infected the functionality finding. You have other reasons why you think the functionality finding is wrong, but not that the judge used the wrong level of intent. That's correct, Your Honor. Intent is not an issue for functionality. I would mention on functionality, Your Honor, I'd ask about other evidence that was presented. The only evidence that ASI presented on functionality, and they have the burden, is they had an expert testify that there was this strength that was created by this convex arc.  He did not see the convex arc before he issued his report. That's the kind of evidence that this Court relied upon, which we think is the case. Well, to be fair, and this is why I asked you about it, because it's troubling to me, there's more. There's your own representation about strength and superiority of function, maybe only 10 years before, but made with respect to this very product. That was introduced also, wasn't it? Yes. And Your Honor would be absolutely right if that advertisement was being used today. That was a 1993 advertisement when the product was launched. It was immediately withdrawn. It was discovered to be in error. It was not tested by Bobrick. It was pulled from the marketplace. And I think the more important evidence is, again, what I've cited to from 2008, where ASI, you'll see, reviews Bobrick's history of this product and why they introduced it. And interestingly, in that memo, there's no reference to this ad. There's no reference to any functionality of the product. All they talk about in that particular document, which, again, is 4610, is they talk about the aesthetic value of the product. And it specifically says that Bobrick did not introduce the product because of any functional advantage of the product, any strength or any vandalism kind of feature of the product. That was ASI's own determination when it released its rebel line. Now, how can they get up in front of a court and say, oh, now it's functional? That's a lawyer argument for the purpose of the case. I asked you about that before, and it seems to me we're crossing across each other. They may not have wanted to copy it because they thought it was functional. They may have regarded its functionality as not particularly important. But that's a separate question from whether it was functional. They might have wanted to copy it because they were evil people who wanted to copy. But if it was functional, it doesn't matter what their intent was, does it? When you see in their documents that they're introducing a product that has a functionality to it, some reference to functionality, some reason why they want to introduce this product because it has a certain advantage in the marketplace, there's nothing in the documents that support that other than this effort to get it on the front. I accept your argument that they're bad people. I accept for purposes of discussion. I accept your argument that they were evil people who didn't care about functionality. All they wanted to do was glom onto your reputation. Right. But that really doesn't matter if, in fact, the product was functional. Do you agree? Yes. I agree with that. And we don't think they presented enough evidence of functionality to me. I understand that argument. Right. Thank you. But ASI had its own name on this product. Yes. And I would defy anyone in this Court to find it if they had the product in their bathroom. It's hidden. It's underneath. It's on the top. You can't find it. You can't see that. And if you look at the pictures in our brief, you don't see any logo there. There's no way of differentiating those two products. It's very simple that they could have done that. They didn't do that. So they intended to copy. And they did copy. Now, we have another problem in this case which made this line of questions much more relevant, which is with the correlation of evidence. But basically it's all right to copy. It's all right to copy. Unless you're palming off your product as another party's product. It creates confusion in the marketplace. Yes, sir. Yes. There's no evidence in this record of creation of confusion. But you say the judge – there was, but the judge kept it out. Yes, he kept out all experts' report entirely on that issue. We think it was an error. I wanted to ask you a question about spoliation. Yes. Is there any way that spoliation could relate to functionality? I understand how the spoliation argument – how the documents withheld might relate to the rest of the case. Right. But with respect to functionality, is there any – I can't perceive the argument about why the withheld documents would relate to functionality. Can you help me there? Yes, I think that it wouldn't be implausible to think that when they came out with this line, which was expensive, that they did an analysis about whether the product had certain advantages in the marketplace, and one of them would be strength, vandalism, those kinds of functionality questions. But we'll never know that because those documents from that time period, 2008 and 2009, no longer exist. They've been destroyed, including documents from their own president and their lead engineer. So, yes, they could have very well gone to functionality because that's something they would have looked at. Now, we do have, again, this tip of the iceberg, this document I referred to, 4610, where they talk about the history of the product and the lack of functionality and the aesthetics of the product. Now, there's no emails in response to that. There's no emails around that because they don't exist anymore. They've been destroyed. So in a case like this where the district court found bad faith, he found bad faith, found gross negligence in their spoliation conduct, he should have, at a minimum, imposed an adverse inference. And we suggest the adverse inference, B, is that the burden should shift to ASI, the perpetrator, the bad guy, to prove all three things, functionality, lack of confusion, and lack of secondary meaning. We think that's the appropriate remedy in light of the bad faith finding. Otherwise, as far as we know, there's no case in this entire circuit where a court has ever found bad faith in a spoliation context and has not at least imposed an adverse inference. And that's not the case. How do we review the district judge's decision there? Under what standard? The spoliation issue? The type of sanction imposed for the spoliation. Well, I think it might be clear error. It's abusive discretion, isn't it? Abusive discretion, yes. There's a difference between clear error and abusive discretion. You're right, Your Honor. It is abusive discretion. It's abusive discretion. And he thought about it. I read the discussion about it. And he didn't want to impose a harsher sanction, one that is essentially a terminating sanction or could result in, you know, filtering the outcome. But I think once you find that somebody acts in bad faith in destroying documents, you're really obliged. But you have some discretion. We would have to conclude that he abused his discretion. The only appropriate sanction in that instance was to impose an inference, and that's an adverse inference or some other similar kind of penalty. Well, let's address that. If I might have time, I'll address that question, which is it was an abusive discretion because the documents we're talking about on functionality, on intent, okay, on confusion, those are documents that would have been in the hands of ASI, both at the time they developed the product and afterwards. But they destroyed those documents. And we have the burden of showing at least likelihood of confusion in secondary meaning. How can we show that if those documents have been destroyed? How can we do that? We can't. It's a vote of confidence. It's an adverse inference. You can bring in a customer and show the potential customer or someone on the however they do it and say, here's this product, this product. Now, what's your reaction when you see the two? Isn't that the way you do it? Yes, and we did. We had testimony. No, you had an expert go out. We had an expert, too. Yeah, but you go out with your legs and do it. With witnesses. Yeah, with actual live people. Yes, we had actual live people.  But I bet you. Affidavits from actual live people. Yes, we did, sir. I thought you said you just did a survey. No, we had also declarations and affidavits from customers and distributors about the confusion. And those affidavits were admitted into evidence? They were admitted into evidence, but we don't think considered as they should have been. And he didn't find them persuasive about confusion? He didn't find them persuasive. He found this to be a very sort of narrow market, right? It's a narrow market, yes. Yes. But I think, Your Honor. A sophisticated narrow market. Well, it's a sophisticated market. But, you know, because of that, you'd expect to see communications with ASI after the release about an issue of confusion. People say, what is this new product? Is this Bobrick's product? Is this your product? We're confused about this. We don't know that because they destroyed those documents. So we've been prejudiced by that. Monetary sanctions don't help us. We need the adverse inference to meet that standard. Okay. Thank you, Your Honor. All right. Thank you. Thank you. Good morning. May it please the Court. My name is Adam Thurston. I represent the APALE in this case, American Specialties, Inc. I have with me my associate Pamela Graham and my former partner. Yes, speak up. Speak up. I'm sorry? Yes, speak up. I'm sorry. I have with me Pamela Graham and my former partner, now retired, Henry Shields. That was retirement. I would like to focus on four things, unless the questions from the Court lead me elsewhere. First, the deference that must be given to the trial court under the appropriate standard of review in this case, which was discussed earlier. Second, the legal errors that Bobrick ascribes to the trial court's functionality, secondary meaning, and likelihood of confusion analysis, which were not errors at all. Third, the expoliation sanctions that were imposed by the trial court and the trial court's proper use of his discretion in doing so. And finally, the importance of the fact that this case involves a product configuration trade dress. It is not a case that involves a trademark consisting of a word or a symbol. This actually concerns the configuration of a product itself. So briefly, let me turn to the standard of review. I thought part of the case dealt with the convict's arc. Wasn't that a trademark? It was a — it had a trademark registration, but the mark, so to speak, was actually the configuration of the front panel of these sheet metal cabinets being slightly convex curved. And so although — To the extent that that was part of the focus of the case here, the judge found that that was functional. Yes. The Court found that that was functional. The Court also found that it had no secondary meaning. And the Court also found that Roval's product using that particular configuration didn't present a likelihood. But the other part of the case was the unregistered trade dress part. Correct. Which consisted of that registered trade — Right. That was one element of the entire package. Correct. Together with other conventional and widespread tropes of sheet metal design, such things as curved edges, rounded corners, flanges around the cabinet to hide the wall opening where these recessed cabinets were installed into in these commercial washrooms, the use of satin finish stainless steel. All of these alleged elements of the trade dress are in common and widespread use and in fact are not only in common and widespread use within the bathroom accessory industry, but also are commonly used in sheet metal. So on the overall trade dress, though, they make a pretty strong argument that the judge did not look at the total effect, the totality of the product. Well, I think that — And the way it was put together and looked and shaped, you know, the whole thing. I think the trial court did, Your Honor. I think that there are some mischaracterizations of what the trial court's decision actually said. What the trial court did was, first, it went through each of the four disc golf factors, examining the convex arc itself, which, of course, there was a separate claim. Yes. That's what I was getting at at the beginning. Yes. Then the court turned to the alleged unregistered trade dress, which had all of these other elements, and proceeded to cite this court's recent decision in Seacole and also pointed to Leatherman and specifically states in his findings of fact and conclusions of law that the rounded edges and corners, for the same reason as the convex arc, enhance strength and rigidity of the product, make it more durable, that the flanges cover the rough wall opening into which the cabinets are installed, and that taken together, these alleged elements of the trade dress, each of them is clearly functional, and together, as a whole, they are nothing more than the assemblage of functional parts in the same way as the elements in Seacole and Leatherman were nothing more than — Can I ask you — I'm sorry, finish your answer. We have a little bit of delay. Finish your answer, and then I want to ask you a question. I was just going to finish by saying we're nothing more than the same kind of assemblage of functional elements as were at issue in Leatherman and Seacole. I wanted to ask you a question about the effects in this case of two things. We have, with respect to the panel, a registered trade. Right, registered trade. Yes, Your Honor. The convex arc had a trademark registration. Right. That gives rise to a presumption of nonfunctionality, does it not? Yes, presumably valid because it became incontestable. Okay. Did the judge in this case think the burden was on your client to overcome the presumption, or did he just think it was the burden of Bobrick to prove nonfunctionality? No, Your Honor. It is quite clear that the trial court got that correct. Okay. The trial court said so on the record in the transcript. Right. Now, I want to turn — I think that's right. I want to turn to the expired patents. What effect should they have in this case, if any? Well, Your Honor, there is authority for the proposition that a design patent provides some evidence of nonfunctionality. But it certainly is not dispositive of the issue, and it may not even be particularly probative of the issue, and the court in this case considered those design patents. The court considered it. My question is, does the design patent give rise to any presumption of nonfunctionality? No, it does not, Your Honor. There is no authority for that proposition. I couldn't find any, but it struck me as strange that the registered trademark would give rise to the presumption, but that a design patent would not. What? Yeah, and I don't necessarily think that registration in and of itself gives rise to a presumption. It is the incontestability that gives rise to the presumption, which is the use of the registered mark in commerce for more than five years in the filing of a declaration. But there is no similar presumption in your view for the design patent? No. There is no such presumption in the law arising out of a design patent. It's just merely evidentiary? Correct, Your Honor. Is there any law to the contrary? I just couldn't find any law in that one way or the other.  I am not aware of any law to the contrary. There is certainly law for the proposition that design patents provide, quote, some evidence of non-functionality, but not a presumption, nothing that can't be overcome. And the probative value of it, of course, is going to depend upon the circumstances of the particular case. In this case, the trial court, sitting as the fact finder, looked at them and found them to be not particularly persuasive of the non-functionality of these particular product designs. Could you address the spoliation issue? Before I do, let me just go, it wasn't quite clear. I'm sorry, go ahead. I want to continue on with this functionality question for just a minute. So our case law makes it clear. You went through and you pointed out that each element, as you just did, that the district court found was functional and that you saw this case as nothing more than being very analogous to Leatherman and Seacolt. Correct? Yes, Your Honor. But our case law also says you have to look at the total effect of these parts. And just because you have individual elements that are functional and put them together does not necessarily result in an ultimate, you know, directly result in the conclusion that the assembled package is functional. We see. So what I'm getting at is what we've said in Fuddruckers and in Cook's Billiards, where we've made it pretty clear there that you can have individual parts, and the way you put them together can be done in such a way that if you look at the total package, it's non-functional. That is all correct, Your Honor. I would make a couple of points about that. My concern here is did the district court judge do that here? Yes, I believe the district court judge did do it. And I would raise two points. First of all, with respect to Cook's Billiards and Fuddruckers, those cases both involve the decor of a restaurant. They're all premised on product cases. Well, but, Your Honor, this is actually — Dig deep into those cases. They all rest on product cases. But this is actually an important point, because in Walmart v. Samara, the Supreme Court actually talked about two pesos, which is a Supreme Court opinion on the same subject. Yes, it's trade drift. That's correct. It involved a restaurant decor, and made the point specifically that restaurant decor is probably more analogous to a packaging case than it is to a product configuration case, or perhaps it's some third thing that is somewhere in between, but that restaurant decor, you know, should not be considered exactly the same as product configuration. Product configuration is a unique area of trademark law precisely because — and this is an important point. So Fuddruckers and Cook's Billiards can be distinguished just on the basis that they're dealing with restaurant design? Well, I think they can be distinguished on that basis, but I don't think that our position in this case is inconsistent with either Fuddruckers or Cook's Billiards. And to Your Honor's point, do the individual elements viewed as a whole still have a functionality problem? And the answer is yes, they do, and we speak to this issue in our brief. It is important to understand that what we're talking about here, it is a sheet metal cabinet. It has a slightly curved front face, and then the sheet metal is rolled at the edges into a rounded shape. The corners are rolled in so that they have a rounded shape, and you have these flanges that cover the wall opening that on their edges has a very slight radius that rolls in towards the wall. And these are the elements of the alleged unregistered trade dress together with the stainless steel and a satin finish. What's important to understand is when you're dealing with a product like this, which is a pretty plain, unadorned sheet metal cabinet that's used in commercial washrooms, and when the elements are the actual shape of the way the product is made, and we're not talking about some kind of an embellished ornamental shape. We're talking about the rounding of edges and the rounding of corners, the way the sheet metal is fabricated. These elements work together to make the cabinet the structure that it is. This is the only way these elements could be put together to make this wall work as a dispensary? But that doesn't matter. It doesn't have to be the only way. And one of the legal errors in Bobrick's position here is the contention that it is nonfunctional unless this is the only way or this is the best way or this is the most functional way to do it. That is not the law under Dysgolf. And one point that counsel made in opening argument that I think needs correcting is counsel pointed out that these are paper towel dispensers. These are waste baskets and sanitary napkin dispensers. And the convex arch shape or the rounded corners don't make them dispense paper towels or hold paper waste better. But that is a gross misstatement of the law. In Dysgolf, in fact, the court specifically said, this court specifically said, when evaluating the functionality of a product configuration trade dress, it is essential that the inquiry not focus, this is a quote, not focus on the usefulness of the article overall, but rather must focus on the utility of that exact feature or combination of features that is claimed as a protectable trade dress or mark. The issue is not whether a product is functional, but whether this particular shape and form of product, which is claimed as trade dress, is functional. So the question is not whether or not the convex arch makes the cabinet dispense paper towels better. The question is whether or not the convex arch has some utilitarian benefit. And in this case, the trial court found that it does. Kagan. Judge Riewerts had a question about slavery. Yeah, I did. And I think you may have answered it, but let me just try to paraphrase your answer and see if I've got it correct. Judge Powers asked you whether or not the judge correctly considered the product as a whole. And all of your responses dealt with its convex nature. Is it your position in this case that that's really the product as a whole, that the convex nature of the product is the product as a whole? And therefore, once the judge determined that the convex nature was functional, he determined that the product as a whole was functional? No, Your Honor. And if my remarks led the court to that impression, then I am wrong. I've had some trouble with that, and that's why I'm asking. So tell me what else made the product as a whole functional other than its convex nature. Well, let me clarify. So when we're talking about the convex nature, we're really talking about the slightly outwardly bowed shape when viewed from above of the front surface of the cabinet. Exactly. When I was talking about the other elements of the alleged unregistered trade dress, for example, the rounded edges, that's not the same as a convex arc on the front face. The point is, is that the engineering principle, which is when you curve a piece of metal, it becomes more rigid and it becomes more impact resistant, applies equally to those radius edges. But there are also other functions to those radius edges that were pointed out at trial and by the trial court, including, for example, by rounding the edge of the cabinet, you eliminate a sharp edge that might cut skin. By rounding the edge of the flanges that cover the rough wall opening, you make the cabinet easier to install against a wall that might have a slightly uneven surface because it closes the gap of that uneven surface and therefore makes installation easier. So I'm not restricting my remarks here with respect to the functionality of the individual elements to merely the fact that they are curved, although that is one aspect of it. But with respect to those elements, it was the – whose bill is it, Bob Ricksburg, to show non-functionality, since those are not part of the registered trade book? That's correct, Your Honor. It's Bob Ricksburg with respect to the unregistered trade address. And as to those, your argument is similar but not identical to the front panel. Well, it is – Which is that they're stronger. They're stronger, but they also serve other purposes, which is that it's easier to clean and they may not catch people's arms, et cetera. Right. And so I would answer that by saying yes, it shares some of the same functional benefits as the convex arc in terms of strength, rigidity, durability, but also others, as the Court pointed out. So if I could then, let me return to – because this – I want to just sort of focus on functionality for a second. I find Bob Ricksburg's argument with respect to secondary meaning and confusion stronger with respect to scoriation, but I want you to focus on functionality. Why shouldn't the judge have drawn an adverse inference with respect to functionality from your client's destruction of documents? Two points on that, Your Honor. First of all, there was no finding that ASI destroyed documents in response to this litigation. And, in fact, there was no finding that any documents were destroyed at all after the service of the complaint. Well, but the documents were missing. I'm sorry. Well, no. There wasn't even a finding that documents were missing, Your Honor. I mean, there was a finding that ASI failed to timely produce documents, failed to timely search for them, failed even to put into effect an effective and timely litigation hold. But there was also a finding that ASI preserved all of its backup media and that ASI stopped destroying or recycling, I should say, the backup tapes that it used. Normally it would recycle them in a two-year cycle, and it stopped doing that in response to this litigation, pursuant to a litigation hold. And then when the court appointed special master, Cogility, Mr. Gorgin, went back and restored all of those backup tapes, there was never any evidence that anyone, for example, deleted emails from their deleted items folder. Those all got restored. Yeah, and maybe I'm using the term more broadly. With respect to the backup tapes that weren't preserved, we don't know what was there, right? There were no backup tapes that were not preserved after the complaint. Well, but I thought there was a – I thought the special master found that there was a policy of, in effect, recycling the backup tapes every two years. Right, but that policy stopped the moment that the complaint was served in this case. Not a single backup tape was recycled after the complaint was served on this case. Right, but there may have been backup tapes that were recycled that may or may not have been relevant in this case. Well, prior to the – But that spoliation, because – well, it may or may not have been spoliation, because it would have depended on whether or not they knew they were at issue. And I'm asking, was there a finding that, with respect to tapes more than two years back, at a point when your client knew that there might be litigation about this, they were recycled? Well, no. There was – the evidence was that the normal – ASI's normal practice was to recycle the tapes on a 24-month period. So they had 24 tapes, and they would just simply – when the 24-month-old tape would be used to then do the current month. So, yes, they were recycled up to the point that the complaint was served in this case. But this is a very important point. There was no dare to preserve anything prior to the time that the complaint was served in this case. Well, that's what the question I was going to ask you. Was there any – were there demand letters? Were there – was there evidence that there was a dispute going on at the time? I don't believe that there were. More than 24 months before the complaint was served? No, Your Honor. I don't believe that there were. I don't believe that there's any evidence in the record of a duty arising prior to the time that the complaint was served in this case. Well, that's what I'm asking. I couldn't find any either. That's what I'm asking. No, I don't think that there was. So there wasn't – 46 months before they didn't write you and put you on notice that they thought you were doing something wrong and that you ought to be aware that there was a lawsuit coming? No, there was no evidence of that. And I was trial counsel, too. It wasn't – I don't believe that there was any evidence of that presented at all. Okay. And so I think that it's important to point out that not only was there not a finding that any evidence was destroyed, but there certainly was no finding that in response to being served with the complaint in this case, ASI undertook some intentional campaign to destroy evidence that would hurt it in this case. No evidence anything of the kind. And this is important because – There was evidence, however, that you withheld relevant documents. And as to those, I take it they were all eventually handed over. And so if there was one that reflected some evidence of that functionality, it would have been introduced to trial. That's exactly right, Your Honor. There was indeed, admittedly, a failure to timely search for and produce documents, but that was cured by the court's special master. Yeah. And one thing I wasn't clear about from the record is it is clear that some tapes were recycled. It wasn't clear to me whether or not the tapes that were recycled were done so after you had any reason to believe that you might have litigation with Bobrick. No. The evidence was that after the complaint was served, ASI stopped recycling backup tapes, and no backup media was ever reused or destroyed after the complaint was served in the case. And the other – the second part of your question, though, I want to answer as well. The court asked why shouldn't the district court have imposed, you know, an issue sanction or maybe a terminating sanction as the sanctions for spoliation of evidence here. And the answer is there is not a single case anywhere, never mind the Ninth Circuit, but anywhere in the United States that I have been able to find in which a court of appeal reversed a trial court for an abuse of discretion by failing to impose terminating or issue sanctions. And in this case, the issue sanctions were essentially terminating sanctions. Terminating. I'm sorry? Terminating sanctions aren't favored. Right. And in this case, even the issue sanctions, they were essentially dispositive issue sanctions. And I think this is a very important point, and I think we can all agree on this. I mean, the court has not questioned that what Bobrick asked the trial court to do was to find conclusively that the trade dress was nonfunctional, that it had acquired a secondary meaning, and that the Roval products presented a likelihood. Before you're – I think you're over your time, but I just have one question on likelihood of confusion. So they have a legal argument that the district court judge erred in excluding the report of their survey, the person who conducted the survey, his report. Did the judge err there? Well, no. Why did he exclude it anyway? Well, remember, the trial court was sitting as the trier of fact. And so the trial court said two things in its order. First, it said that Dr. Kogan's survey – Dr. Kogan is female, by the way – was unpersuasive. It effectively predetermined its result because the questions were so leading and because the stimuli that were used were so leading, and found her testimony on the witness stand when pressed on these issues to be such that her report was unpersuasive, not credible. So there was – So it was admitted into evidence. He did admit it into evidence, and she was cross-examined on it, and it was received in evidence. But in the Court's findings of fact and conclusions of law, after saying this report is not credible in any way, the Court said, in fact, it's so bad as to be inadmissible under Rule 702. Now, let's just assume for the moment that that was error. Even if it was error, it was harmless error, because the Court just found the report and the testimony of Dr. Kogan to be utterly without any credibility at all. So he did receive it into evidence. He later said that it was so bad as to probably not be admissible. Whether that's right or wrong really is immaterial to the outcome of this appeal. Unless the Court has further questions, I'm over my time. So thank you. Thank you. I'd like to start with Your Honor's question. The expert report was not received into evidence. It was rejected. So it never went into evidence. It never gave any weight in a non-jury case. And I think this Court, I think Judge Pegersen, you in your Gallo case said that such What part of the record do you cite for the proposition that it was never admitted into evidence, other than the judge's findings, which I have in front of me? I would think it would be during her cross-examination at trial. She testified, and her report was attempted to be admitted and was rejected. So it was proffered. It was proffered, and the judge said, I won't take that report into evidence. He did not take it into evidence, did not consider it at all. That was his finding, yes. And you think that's reflected at the part of the trial where she testified? I think so. Okay. Didn't he say it wasn't reliable? Yes. So I can explain what happened there. She did a test where she showed different advertisements. Okay.  She showed different advertisements of this product and similar products to sophisticated purchasers, architects. And she basically asked them under, you know, procedures whether or not there was any confusion as to those ads. Okay. Now, first off, the Barbrook and the ASI ads looked exactly the same. And why? Because they copied our ad. Of course they looked the same. And then she used ads of other competitors, which she'd gotten off the Internet, off of their catalogs, the kinds of places that architects would go to look at the advertisement to see whether they wanted to buy the product or not. That's the real world. That's what she used. His ruling was she should have used the same size advertisements for all of those companies. They're just not available. That's not a reason to reject her report entirely. You may give it less weight, but you can't reject it. So that was a mistake that he made, an abuse of discretion. Your Honors, if I could talk a little bit about the backup tapes when we were talking about the scorrelation. The backup tapes are just a snapshot at the end of the month capturing what exists as of that date. If somebody destroys their emails before the snapshot's taken, they're gone. You'll never see them again. And incidentally, you would ask the question about, Judge Horowitz, when the first backup tape was. The earliest backup tape was January of 2010. The complaint was filed September of 2010. So I'm not sure that there's evidence that the backup tapes existed for the entire time period. And I think we had evidence that there were at least two months where there were no backup tapes. But putting that aside, these backup tapes do not reconstruct the world that exists of emails. It only takes this little snapshot at the end of the month. That's a problem we have. Interestingly, a document that I was referring to, 4610, which is this email from 2008, this document was written by a former Bobrick distributor who then worked for ASI to the engineer at ASI, Dennis Jackson. When Mr. Jackson was deposed at his deposition, he was asked if he had any emails. His answer was, yes, I have emails. After the deposition, he said, produce his emails. And they represented to us in the court there were no emails. Then all of a sudden, they found this email during the trial. And this is a very, very important email, which we had no right to cross-examine any of the witnesses about other than Mr. Jackson at trial. So was there prejudice? Absolutely. Was there bad faith? Absolutely. And that's what the district court found. Your Honor, there was an argument or an issue about did the district court properly apply these standards of functionality. There is one thing that he did which we think is a manifest error. And, Judge Pegerson, this goes to a case that you wrote called Fabrica, you may recall just recently. And in the Fabrica case, you said that the doctrine of aesthetic functionality had been rejected repeatedly in the Ninth Circuit, going back in time to other cases. In this case, the district court in its findings, this is at page 67, 68, 74, and 75, repeatedly referred to the aesthetic benefits of the contour line and the aesthetic value in the eyes of consumers which validated its use. That's aesthetic functionality. That is what he found. That is contrary to the law of this circuit. That's fundamentally an error in his functionality findings. Why don't you give me a list of all my cases this morning? We actually had cited that in the brief, Your Honor. We had cited that in the brief before you were on the panel. No, that's all right. But I'd like to have one clear list. And I'll look at them all and see how they curve out. I think it will be a long list, Your Honor, since you've been on the bench a long time. It's okay. I've got time. Okay. All right. Also on the issue of functionality, Judge Hurwitz, I would refer you to the Dog Lube case and Fiji Water case that we cite in our briefs, where in those cases there was also evidence of advertisements that those companies had issued on a functional aspect of their product. And in both cases, the Court said that that wasn't probative of whether the entire product as a whole was indeed functional. And therefore, I think those cases are very destructive to the issue here. Also, Judge Hurwitz, there is authority, and we've cited it in our brief, that a design patent is entitled to a presumption of a lack of functionality, a strong evidence of a lack of functionality. And the two cases we rely upon are both out of the Federal Circuit. It's the Elmer case and the Burton case. Given that the trial judge gave a presumption of non-functionality to your registered trade dress trademark, assuming that he didn't give a separate, it would still be the same presumption, wouldn't it? You'd have to overcome it. Yes. So even if he didn't give it a separate presumption of functionality, would it make any difference here? Well, I think the presumption gets us somewhat down the road, and he didn't give us that. No, I'm saying we all agreed that the judge gave a presumption of functionality, of non-functionality, I'm sorry, because of the registered trademark, correct? Yes. He said so in his order. Yes, he did. And would it make any difference if he forgot to give a presumption of non-functionality because of the design patent? Well, I think so. Are they cumulative, or are they just the same presumption? No, I think it's a difference. I think that a design patent, you know, I'm not an IP lawyer, but a design patent, as I understand it, gets into all the aspects, the mechanical aspects of a particular product. And in order to get the patent, you have to go to the trademark and patent office to get their approval, okay? Now, I understand. I'm not an IT lawyer either, but that much I understand. My question is a slightly different one. Is the presumption that arises, in your view, from a design patent, different than the presumption that arises from a registered trademark? I think there is a difference here. I think the presumption here, when you have 14 design patents over a period of years, as opposed to one registered trademark, it's more of a presumption with the design patents. And I think he should have taken that into account. He didn't take that into account at all, at all. He didn't address that issue. I think that was an error. Judge, let's get back to your ---- This product of yours came on the market when? 1993, Your Honor. 1993. And when did you seek to protect it? Soon thereafter, 94, 95, yes. That's when the design patents went into effect. Not into the 21st century, no? No, I don't believe so. And there was no challenge to the design patents by ASI during that time. Oh, I'm just asking. Judge, Pragerson has been very generous with your time. Yes. I'm out of time. Thank you, Your Honor, for your patience. We'll do time today. Thanks for reading my cases. Seriously, send me a list, you know. Okay. We do about 500 cases a year. You know that? No, I do not. Yeah, well, you learned something. Very impressive. Yeah. Thank you, Your Honor. And they're not all as much fun as these. Thank you. Let me ask you a question. Certainly. You see those two gentlemen in the picture behind? Yes. Jefferson and Jackson, yes? You're right. I think that was a good choice. There's a commonality there, isn't there? They're done by my daughter, but that's not on the record. They're wonderful. Who drafted them? My daughter. Who? His daughter. What did he say? His daughter. Oh, your daughter. That's good. They both look a little like you. Well, they're nice. I like the one of Jackson better. Jefferson looks worried. All right. Thank you very much. And the court will recess until tomorrow morning at 9 o'clock. All rise. The court has a recess until 9 a.m. tomorrow morning. Thank you.
judges: Pregerson, Paez, Hurwitz